UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NANCY LEWIS,
    Plaintiff,

v.                        Civil Action No._____

RIO GRANDE SUN,
    Defendant.

CIV 09-016

FILED at Santa Fe, NM
JAN - 8 2009
MATTHEW J. DYKMAN
CLERK

## COMPLAINT FOR COPYRIGHT INFRINGEMENT

    COMES NOW Nancy Lewis, Plaintiff in the above-cited action, charging that the Defendant infringed upon her copyright as author of works published by the so-called newspaper Defendant in at least two instances and begging the Court for punitive and compensatory damages. TO WIT:

    I. On June 7, 2007 (See Exhibit A), the Defendant published a front-page news story written by the Plaintiff minus her byline. The Defendant has asserted in an attendant case in First District Court that it owns the copyright to this story and can thus do with it as it wishes – including leaving off her byline, apparently (see below) – because Plaintiff was an employee and the piece is thus a work for hire. Plaintiff disputes this on the grounds that even though a work contract existed, Defendant was not providing Plaintiff health benefits, a prerequisite for being considered an employee when it comes to the issue of who owns copy rights, according to expert in the field of copyright law Attorney Stephen Fishman (The Copyright Handbook, 9th edition, 2006).

    In *Community for Creative Non-Violence Et Al. v. Reid* 490 U.S., 730 (1988), the U.S. Court of Appeals for the District of Columbia Circuit set the record straight on the issue of who, exactly, is an "employee" under laws impacting copy rights when it upheld

the Court of Appeals' reversal of a District Court ruling for the commissioner of the sculpture, whose copy rights were at issue, the CCNV.

Sculptor for the nativity scene titled, "Third World America," which depicted the plight of the homeless in this Nation, was James Earl Reid. The nature of the display was to be:

> (A) sculpture . . . in lieu of the traditional Holy Family, the two adult figures and the infant would appear as contemporary homeless people huddled on a streetside steam grate. The family was to be black (most of the homeless in Washington being black); the figures were to be life-sized, and the steam grate would be positioned atop a platform "pedestal," or base, within which special-effects equipment would be enclosed to emit simulated "steam" through the grid to swirl about the figures. . . .. and a legend for the pedestal: "and still there is no room at the inn." (ibid, p. 733)

Reid found an infant study for the triage at a Washington, D.C. homeless shelter. He toured the streets and watched freezing homeless people crouch and lie over the steam vents, and after his first-hand look at how America treats its dispossessed in its capitol city, drew the studies for the adults in the sculpture only in reclining positions.

Another issue between the parties outside this action was whether the material used for the sculpture would be easily, handily destructible or not – *not*, as in bronze – presumably so that history could thusly be rewritten. Design Cast 62, from which the statue was made, is a synthetic substance that could withstand the elements and was, unlike bronze, cheap.

Later, when CCNV proposed to take the statue on a tour to raise money for the homeless, Reid objected, contending that the material the statue was made of was not strong enough to withstand the ambitious itinerary. He again urged CCNV to cast the statue in bronze or to create a master mold of it. CCNV declined.

The High Court ruled in the artist's favor over the copyright issue, saying the sculptor owned the copy right since the Defendant's contention that it was a work made for hire was specious in that, for one thing, CCNV had not provided Reid – technically an independent contractor – benefits considered part of the employee-employer relationship.

Defendants ". . . did not . . . provide any employee benefits. . . ." (ibid, p. 731).

Plaintiff in the present case was not receiving health insurance from Defendant, as were all other employees, and surely health insurance is the major benefit an employee thinks of when referring to employment benefits.

This legal precept regarding copy rights was reaffirmed more recently in *Gaiman v. McFarlane,* 360 F.3d 644 (7th Cir. 2004), in rather an obverse manner:

The Defendant, a comic book publisher, sought to overturn a lower court decision for the artist who had imagined and drawn Spawn, a medieval character – whose henchmen are officers in an army of the damned commanded by a devil named Malebolgia, who hopes one day to launch his army against Heaven. The artist sought joint rights with the publisher, and one can imagine what was at stake – the high value of reproduction – since there are so many of Malebolgia's henchmen already among us, dressed in flesh, and how full of themselves they are. Since that is all the artist asked for, that is all he got – half interest – but in the course of explaining how the High Court had arrived at its decision for the creator, the justices wrote, "Commissioned work not falling under definition of works made for hire may be deemed a work for hire as a work created within scope of employment if, for example, the commissioning party pays the author a monthly stipend, pays health and other fringe benefits during the time the author works on the project . . ." (ibid, p. 645)

II. On May 17, 2007 (See Exhibit B), Defendant published an edited version of Plaintiff's news story updating the former rapist judge Charles Maestas' legal maneuverings to clear his unholy name. Defendant altered Plaintiff's story without her knowledge and permission in regard to only one word, changing a reference to Maestas' dozens if not hundreds of victims as "women" to "inmates," thereby convicting them of (we must presume, dearest patriarchy) prostitution for giving the judge (pardonez mois Francais) blow jobs to get off (no pun intended) on traffic tickets and jail time, at the same time the First District Court was in process of letting Maestas off the hook once and for all (he'd served a couple of years and paid the damaged women a pittance, it seems) so that he didn't have to be on any sex offender list. Way to go, guys.

Plaintiff sought a correction – actually, asked for a front-page retraction – which only exacerbated the damage to Plaintiff's reputation, not to mention that of Maestas' victims, but do, please. Published in the May 24, 2007, edition (See Exhibit C), the alleged correction reads:

"The story incorrectly stated due to an editing error (which could be construed to mean that Plaintiff had called the women inmates, and the editor had failed to catch it) that former Espanola Municipal Court judge Charles Maestas was originally convicted of soliciting oral sex from at least one female inmate. She was actually a defendant in his court, court documents state." (Parenthetical added)

This exculpates only one woman and leaves the rest behind bars for opening their mouths, Plaintiff guesses. No pun intended, of course.

According to Fishman, any alteration of a writer's work that impinges upon the work's integrity, and this sure does – destroys it, in fact, in Plaintiff's name and the

names of Maestas' victims-turned-jailbirds – constitutes **copyright infringement** (See *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14 (2d Cir. 1976).

In *Gilliam,* writers and performers of the Monty Python show obtained an injunction stopping ABC from airing programs it had heavily edited, the High Court saying that changes constituted "actionable mutilation" "where injury to Plaintiff's reputation" had likely resulted from cuts made. Cuts included words such as "hell" and "damn."

Citing precedent (*Grove v. Greenleaf Publishing Co.,* 247 F Supp. 518 [S.D.N.Y. 1965]) and calling the slash job which had not been approved by the artists "unilateral," an "excising" which created a "truncated version" of the original work in order to obtain the "greatest economic exploitation of the work," the High Court estimated some 27 percent of the work had been edited, which might possibly have been permissible but for the fact that the editing created a "derivative . . . (that) affects the force or validity . . . in the matter from which it is derived."

In addition, said the High Court, editing violated the Lanhan Act (See below).

Wrote the Justices,

> This cause of action, which seeks redress for deformation of an artist's work, finds its roots in the continental concept of droit moral, or moral right, which may generally be summarized as including the right of the artist to have his work attributed to him in the form in which he created it. See 1 M. Nimmer, supra at 110.1.

> American copyright law, as presently written, does not recognize moral rights or provide a cause of action for their violation, since the law seeks to vindicate the economic, rather than the personal, rights of authors. Nevertheless, the economic incentive for artistic and intellectual creation that serves as the foundation for American copyright law, *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); *Mazer v. Stein,* 347 U.S. 201, 74 A.Ct. 460, 98 L.Ed. 630 (1954), cannot be reconciled with the inability of artists to obtain relief for mutilation or misrepresentation of their work to the public on which the artists are

financially dependent. Thus courts have long granted relief for misrepresentation of an artist's work by relying on theories outside the statutory law of copyright, such as contract law, *Granz v. Harris*, 198 F.2d 585 (2d Cir. 1952) (substantial cutting of original work constitutes misrepresentation), or the tort of unfair competition, *Prouty v. National Broadcasting Co.*, 26 F.Supp. 265 (D.Mass.1939) See Strauss, The Moral Right of the Author 128-138, in Studies on Copyright (1963). Although such decisions are clothed in terms of proprietary right in one's creation, they also properly vindicate the author's personal right to prevent the presentation of his work to the public in a distorted form. See *Gardella v. Log Cabin Products Co.*, 89 F.2d 891, 895-96 (2d Cir. 1937); Roeder, The Doctrine of Moral Right, 53 Harv.L.Rev. 554, 568 (1940).

Here, the appellants claim that the editing done for ABC mutilated the original work and that consequently the broadcast of those programs as the creation of Monty Python violated the Lanham Act 43(a), 15 U.S.C. 1125(a). *Footnote from text here: That statute provides in part: Any person who shall affix, apply, or annex, or use in connection with any goods or services, . . . a false designation of origin, or any false description or representation . . . and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action by any person . . . who believes that he is or is likely to be damaged by the use of any such false description or representation.* This statute, the federal counterpart to state unfair competition laws, has been invoked to prevent misrepresentations that may injure plaintiff's business or personal reputation, even where no registered trademark is concerned. See *Mortellito v. Nina of California*, 335 F.Supp. 1288, 1294 (S.D.N.Y.1972). It is sufficient to violate the Act that a representation of a product, although technically true, creates a false impression of the product's origin. See *Rich v. RCA Corp.*, 390 F.Supp. 530 (S.D.N.Y.1975) (recent picture of plaintiff on cover of album containing songs recorded in distant past held to be a false representation that the songs were new); *Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 267 (S.D.N.Y.1968).

These cases cannot be distinguished from the situation in which a television network broadcasts a program properly designated as having been written and performed by a group, but which has been edited, without the writer's consent, into a form that departs substantially from the original work. "To deform his work is to present him to the public as the creator of a work not his own, and thus makes him subject to criticism for work he has not done." Roeder, supra, at 569. In such a case, it is the writer or performer, rather than the network, who suffers the consequences of the mutilation, for the public will have only the final product by which to evaluate the work. *Footnote from text of decision here: This result is not changed by the fact that the network, as here, takes public responsibility for editing.* See Rich v. RCA Corp., *supra*. Thus, an allegation that a defendant has presented to the public a "garbled," *Granz v. Harris*, supra (Frank, *J.* concurring), distorted version of plaintiff's work seeks to redress the very rights sought to be protected by the Lanham Act, 15 U.S.C. 1125(a), and should be recognized as stating a cause of action under that statute. See *Autry v. Republic Productions*,

*Inc.*, 213 F.2d 667 (9th Cir. 1954); *Jaeger v. American Intn'l Pictures, Inc.*, 330 F.Supp. 274 (S.D.N.Y.1971), which suggest the violation of such a right of mutilation could be proven.

And from the concurrence: . . . *Speaking of the case in a footnote: A single example will illustrate the extent of distortion engendered by the editing. In one skit, an upper class English family is engaged in a discussion of the tonal quality of certain words as "woody" or "tinny." The father soon begins to suggest certain words with sexual connotations as either "woody" or "tinny," whereupon the mother fetches a bucket of water and pours it over his head. The skit continues from this point. The ABC edit eliminates this middle sequence so that the father is comfortably dressed at one moment and, in the next moment, is shown in a soaked condition without any explanation for the change in his appearance. . . . since the gravamen of a complaint under the Lanham Act is that the origin of goods has been falsely described, a legend disclaiming Monty Python's approval of the edited version would preclude violation of the Act. We are doubtful that a few words could erase the indelible impression that is made by a television broadcast, especially since the viewer has no means of comparing the truncated version with the complete work in order to determine for himself the talents of plaintiffs.*

..............................................................................................................

I believe that this is the first case in which a federal appellate court has held that there may be a violation of the Lanham Act with respect to a common-law copyright. The Lanham Act is a trademark statute, not a copyright statute. Nevertheless, we must recognize that the language of Section 43(a) is broad. It speaks of the affixation or use of false designations of origin or false descriptions or representations, but proscribes such use "in connection with any goods or services." It is easy enough to incorporate trade names as well as trademarks into Section 43(a) and the statute specifically applies to common law trademarks, as well as registered trademarks. Lanham Act 45, 15 U.S.C. 1127.

..............................................................................................................

The Copyright Act provides no recognition of the so-called *droit moral,* or moral right of authors. Nor are such rights recognized in the field of copyright law in the United States. See 1 *Nimmer on copyright,* 110.2 (1975 ed.). If a distortion or truncation in connection with a use constitutes an infringement of copyright, there is no need for an additional cause of action beyond copyright infringement. Id. at 110.3. An obligation to mention the name of the author carries the implied duty, however, as a matter or contract, not to make such changes in the work as would render the credit line a false attribution of authorship, *Granz v. Harris,* 198 F.2d 585 (2 Cir. 1952).

>So far as the Lanham Act is concerned, it is not a substitute for *droit moral* which authors in Europe enjoy. If the licensee may, by contract, distort the recorded work, the Lanham Act does not come into play. If the licensee has no such right by contract, there will be a violation in breach of contract. The Lanham Act can hardly apply literally when the credit line correctly states the work to be that of the plaintiffs which, indeed it is, so far as it goes. The vice complained of is that the truncated version is not what the plaintiffs wrote. But the Lanham Act does not deal with artistic integrity. It only goes to misdescription of origin and the like. See *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33, 36 (2Cir. 1962).
>
>The misdescription of origin can be dealt with . . . by devising an appropriate legend to indicate that the plaintiffs had not approved the editing of the ABC version. With such a legend, there is no conceivable violation of the Lanham Act. If plaintiffs complain that their artistic integrity is still compromised by the distorted version, their claim does not lie under the Lanham Act, which does not protect the copyrighted work itself but protects only against the misdescription or mislabelling.
>
>..............................................................................
>
>. . . (U)ltimate relief must be found in some other fountainhead of equity jurisprudence.

Overceding all of the above, moreover, is this observation from Fishman: "Moral rights are rights an author can never transfer to a third party, because they are considered an extension of her being. Briefly, they consist of the right to proper credit or attribution whenever the work is published, to disclaim authorship of unauthorized copies, to prevent or call back distribution under certain conditions, and to object to any distortion, mutilation, or other modification of the author's work injurious to her reputation. . . . The Berne Convention (an international copyright treaty) requires that signatory countries extend these rights to authors. . . . In 1991, Congress amended the Copyright Act to extend certain moral rights to visual artists, . . . but the U.S. has not granted similar rights to authors. The courts will have to decide whether moral rights must be granted to writers under American copyright law pursuant to the Berne Convention.

" However, American courts have recognized certain types of rights that are analogous to moral rights, although they may not be referred to as such. For example, any author of a work published in the U.S. retains the right to have his authorship continuously recognized on works that remain true to the original. Conversely, an author retains the right to have her name taken off a work that has been substantially changed from the original. . . ." (p.211-212).

Fishman goes on here to refer to the Lanham Act and cites *Gilliam* as an example of unauthorized changes so extensive as to impair integrity qualifying as copyright infringement.

WHEREFORE, the Plaintiff begs the Court to rule in her favor and award her proper punitive and compensatory damages.

Respectfully submitted,

Nancy Lewis, *Pro Se*
Post Office Box 596
Espanola, NM  87532
Tel: 505 927-3740

## Sued for Rights V[iolations]

### Man accuses police

By Sarah Welsh
SUN Assistant News Editor

A Cordova man who was arrested by La Police nearly two years ago ha[s sued for] il rights.

The lawsuit brought by Billy [...] arrest that happened outside Mc[...] la Police also alleges a general atmosph[ere ...] tions and abuse of power whi[le under] chief Richard Guillen.

"The injuries suffered pla[intiff include] negligent hiring, retention and [...] chief of police Guillen," the [lawsuit] claims that officers were [...] unqualified to serve as piece o[f ... in]cluding those with a documente[d ...] moted to supervisory positions [...] handle."

Romero's lawyer is Richard [...] 2003 on behalf of former poli[ce officer] claimed he was passed over for [...]

See Law [...]

---

## Man Not Guilty in Shooting Retrial

SUN Staff Report

The jury in Javier Quihuis' retrial May 30 returned a verdict of not guilty.

State District Court Judge Tim Garcia was advised of the panel's decision around 2 p.m. after the jury had been sequestered for four hours in Santa Fe District Court.

"We have to accept that," Assistant District Attorney Lloyd Drager said. "That's the system."

Quihuis, 23, spent close to four years in prison for the 2001 shooting death of Nick Hernandez before the State Court of Appeals overturned the decision.

The Appeals Court found Garcia had failed to instruct the jury as to the implications of multiple aggressor self-defense.

"(Quihuis was) happy that the jury made that decision," defense attorney Michael R. Jones said. "Now he can get on with his life."

The night of the shooting, Quihuis, Hernandez and two of his friends — all three reputed to be gang members — advanced on him following a warning shot at their feet, according to testimony in the week-long trial.

The three men had issued threats they would rape those present at the 17th birthday party for Quihuis, including females comebacks escalated until Qui[huis], who, according to one witness [...]

had sequestered themselves in a bathroom out of fear of what would happen as the loud arguing and scuffling they could hear advanced.

Hernandez had alcohol and cocaine in his system, according to the autopsy report.

Hernandez and his friends, one wearing a tow chain around his neck, had arrived in a belligerent mood to the La Villita party in the wee hours of the morning and proceeded to cause trouble, according to testimony.

Invited or uninvited, the troublemakers were soon asked to leave, but paused at the foot of the steps to Quihuis' trailer as they moved to depart, and that's when things got nasty, according to testimony. Verbal threats and comebacks escalated until Quihuis stepped off the porch and retrieved the shotgun from the trunk of his car.

Back on the porch, flanked by his friends, Quihuis ordered Hernandez and his two friends to leave the premises, but they stood their ground, one with his hands in his pockets. Quihuis testified that he understood that man to have a gun in his pocket. Then Hernandez and the other two took a step toward the stairs, according to testimony.

That is when Quihuis fired a warning shot at the feet of Hernandez, who instead of backing off, moved, along with his friends, forward toward Quihuis, according to testimony.

"We can't have the message going out to the community that it is alright to shoot someone like this," prosecutor Tyr Loranger said.

Ex

SUN, Thursday, May 17, 2007

**PLAINTIFF'S EXHIBIT 10**

# Cra... Judge Denies Motions; ony Maestas to Be Retried
## Charges

By Nancy Lewis
SUN Staff Writer


**Maestas**

Former Española municipal judge Charles Maestas must face a retrial on rape and bribery charges, a Santa Fe judge ruled Monday.

State District Court Judge Michael Vigil denied defense attorney Tony Scarborough's motions to dismiss the new charges against Maestas on the grounds it would be double jeopardy, a situation prohibited by the United States Constitution.

The former municipal judge, who was originally convicted of soliciting oral sex from at least one female inmate, had already served his nearly three-year prison sentence on the 2003 conviction before the state Supreme Court overruled the trial court on a technicality.

Earlier this year, Maestas was charged under a state law that doesn't exempt judges from prosecution.

The defense motions Judge Vigil denied this week "raise interesting legal issues which New Mexico courts haven't responded to," Vigil said, adding that he would certify the case for appeal.

"We want to go to trial," Scarborough quickly told the judge.

Though five women testified against Maestas in his first trial, the jury only convicted him of bribing and raping Suzette Salazar, who taped her sexual encounters with Maestas. When the Supreme Court voided his felony convictions last year, he was removed from a state sexual offenders registry.

Maestas is also suing his former attorneys, Stephen Aarons and C. David Henderson for gross negligence in failing to defend their client on the grounds that the statute under which he had been charged exempted judges.

Assistant Attorney General Julie Ann Meade told Vigil at a hearing earlier this month that the United States Supreme Court ruled a defendant could be retried after a Montana court convicted him of incest under the wrong statute, showing that the Constitution's Fifth Amendment does allow retrial after a conviction is reversed because of a defect in the paperwork.

Maestas is currently manager of La Cocina Restaurant in Española.

---

ees it narrowly miss two lice cars headed in the direction.
then travels through a dust kicked up by the and sees the white ying on its left side. A vas lying motionless a rom the car, and a small d over her.
patrol video, Romero self out of the driver's ow and staggers uncer-

ling to police docu- omero had underesti- left curve just south of rkway. He lost control, rn and hit a rock wall ling the car at least
came to rest on its st a tree.
aid Martinez did not seat belt and was ap- ected from the passen- ough the sunroof. It is ether the couple's son nero was thrown from crawled out immedi- he crash, Lopez said.
g to an online court abase, a man with the and birth date as urrently awaiting tri- aggravated battery 2006.
lso convicted of ag- nk driving in 2002.


ExB

---

# m Appeals Civil Suit

ourt rules, plaintiffs 10 days to file a ...tement which de- he lower court erred

protection, and breach of a duty to investigate crimes.
Garcia was raped the night of July 12, 2004, by an unidentified male intruder who tied up her

claim of differential treatment. Furthermore, citizens have no recognized right to "control or direct the course of a criminal investigation," the judge's decision

# NEWS BRIEFS

## Thieves Ransack Española Store

SUN Staff Report

Española Police have made arrests in a break-in at a Dickies store at Española Mall.

Officer Danny [...] group of individuals [...] Street Works through an air duct in the ceiling after climbing onto the roof sometime during the night of May 16 and May 17 and ransacked the store and stole several clothing items and accessories.

Before the burglars broke into Street Works, they hit the neighboring offices of the Farm Service Agency, Pacheco said.

"I think they hit the wrong ducting system," he said.

The burglars only stole some half-dollars from the Agency's [safe] and some items they left in [the] duct, Pacheco said. It appears the thieves' real target was [Street] Works. They stole clothes, [ne]cklaces and ransacked the [store].

"They trashed it," Pacheco said.

Pacheco said he found four or five sets of footprints at the scene. He said the case has been handed over to the Police Department's criminal investigation unit. He said he had not received an inventory of all the items stolen from Street Works. He estimated the damage to the store was in the thousands of dollars.

[Heredia, 37, of Española] Rodriguez's exact condition [was not released].

She apparently signed a privacy statement, said the patient information person at St. Vincent's Hospital in Santa Fe.

Heredia was arraigned May 14 and was originally detained on a $20,000 surety bond. Three days later Rio Arriba County Magistrate Court Judge Alex Naranjo increased Heredia's bond to $500,000 cash only.

Heredia was being held at the Rio Arriba County Detention Center in Tierra Amarilla until his case goes before a grand jury sometime before June 15, according to court documents.

Heredia was charged with grave bodily injury by a vehicle, aggravated battery against a household member, assault with a deadly weapon and kidnapping.

Sophie Martinez, of Canjilon, came upon Heredia and Rodriguez arguing along Highway 84 just north of Still Ranch in Chama.

"They were fighting," said Martinez. "She tried to wave us down."

Martinez' daughter Melisha [...]

## CORRECTIONS

A story titled, "**Judge Denies Motions; Maestas to Be Retried**," on page A10 of the May 17 issue requires a correction.

The story incorrectly stated due to an editing error that former Española Municipal Court judge Charles Maestas was originally convicted of soliciting oral sex from at least one female inmate.

She was actually a defendant in his court, court documents state.

## Guidelines to place your [announcement]

Weddings, anniversaries, events and other activities are important to us. We are a community newspaper, and that means we want to reflect all the news of our Northern New Mexico communities.

In short, we want your news. To make it easier for our readers to submit news to their newspaper, we offer the following guidance:

**Contact information:**
Kevin Bersett
news editor
rgsun@cybermesa.com
753-2126 (phone)
743-2140 (fax)

• **Write legibly.** Include a contact name and phone number in case we have questions.

• **Include basic** [information]
Who are you (or yo[u])
are you doing? Whe[n will the]
event take place? W[here is the]
event? (Date and ti[me])

• **Remember the** [announcement]
announcement mus[t]
be turned in by noo[n the]
week of publication.

---

# RIO GRANDE SUN

*Serving Rio Arriba County since 1956*

The Rio Grande SUN (USPS 466-220) is publishe[d at] N. Railroad Avenue, Española, N.M. 87532. Ro[...] cals Postage Paid at Española NM 87532. POST[MASTER:] Rio Grande SUN, P.O. Box 790, Española NM 8[7532]

**TELEPHONE:** 753-2126
**MAILING ADDRESS:** P.O. Box 7[90]

Ex C